IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RODDY PIPPIN, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-09-4100 |
| | § | |
| RICK THALER, ET AL., | § | |
| | § | |
| *Defendants*. | § | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Roddy Pippin, a state inmate represented by counsel, seeks equitable relief in the form of a temporary restraining order and permanent injunction under section 1983. He complains of deliberate indifference by prison officials and physicians to his serious medical needs. Pending before the Court is plaintiff's motion for a temporary restraining order (Docket Entry No. 2), to which defendants have responded (Docket Entry No. 8).

Having considered the motion, the response, the exhibits, the record, and the applicable law, the Court DENIES the motion for a temporary restraining order, as follows.

*Background and Claims*

Plaintiff states that he was released from prison in 2007, and that, until his return to prison in November of 2009, his Type I diabetes was successfully managed by his free world endocrinologist, Dr. Eric Orzeck. Plaintiff complains that, upon his return to confinement in November 2009, prison physicians have consistently mismanaged his diabetic care, causing him poor health and a reduced life expectancy. By this lawsuit, he seeks permanent

injunctive relief ordering his release from physical custody of the Texas Department of Criminal Justice ("TDCJ"). By his instant motion, plaintiff seeks his temporary release from TDCJ physical custody so that he may "receive proper medical care which TDCJ indicates they cannot deliver." (Docket Entry No. 2, p. 11.) He further requests that the Court order TDCJ to then provide plaintiff "proper medical care from an appropriate medical care provider." *Id*. Although plaintiff does not specify what would constitute "proper medical care" and does not identify an "appropriate medical [care] provider," he is adamant that both are available only if he is released back into "the free world."

This Court has previously indicated that it has no authority or jurisdiction to order plaintiff released from physical custody of TDCJ under these circumstances, and plaintiff has provided the Court no applicable authority to the contrary.[1] Regardless, as shown below, plaintiff fails to meet his burden of demonstrating entitlement to temporary injunctive relief.

### *Analysis*

To merit a temporary restraining order, plaintiff must establish that (a) there is a substantial likelihood of ultimate success on the merits; (b) the order is necessary to prevent irreparable injury; (c) the threatened injury outweighs the harm the temporary restraining order would inflict on defendants; and that (d) the temporary restraining order would serve

---

[1] Plaintiff claimed he could avoid serious injury and death only if this Court released him from prison and placed him in "constructive custody" of his free world physicians under Texas Code of Criminal Procedure Art. 42.12 § 15(i) and Texas Government Code § 507.031. The Court noted that plaintiff's reliance on those provisions was misplaced, as they did not authorize this Court to release him from physical custody of TDCJ to the "constructive custody" of his free world physicians. (Docket Entry No. 4.) Plaintiff has not furnished the Court with any other legal authorities.

the public interest. *Sierra Club v. City of San Antonio*, 112 F.3d 789, 793 (5th Cir. 1997). Because plaintiff does not meet, at minimum, the first two factors, he does not merit preliminary injunctive relief, as shown below.

Plaintiff fails to demonstrate a substantial likelihood that he will prevail on the merits of his underlying case, as he neither alleges nor shows that he exhausted his administrative remedies prior to filing this lawsuit. *See* 42 U.S.C. § 1997e(a); *Porter v. Nussle*, 534 U.S. 731, 739 (2001). Although the Court cannot, *sua sponte*, dismiss this suit based on failure to exhaust,[2] it is not precluded from referencing such failure as negating plaintiff's likelihood of success on the merits. Consequently, plaintiff fails to meet his burden of proof under the first factor.

Nor does plaintiff demonstrate that a temporary restraining order is necessary to prevent irreparable injury. According to plaintiff, his particular form of Type I diabetes is especially difficult to manage and requires frequent daily monitoring. He argues that TDCJ physicians and prison medical facilities cannot provide the level of medical monitoring and care he needs in order to avoid serious medical complications and death. Defendants, on the other hand, argue that any difficulty in managing plaintiff's condition has been due to his own refusal to follow medical orders or cooperate with prison physicians.

---

[2] *See Jones v. Bock*, 549 U.S. 199, 211 (2007) (treating the administrative exhaustion requirement of 42 U.S.C. § 1997e(a) as an affirmative defense even though "[t]here is no question that exhaustion is mandatory under [section 1997(e)] and that unexhausted claims cannot be brought in court").

Although plaintiff has submitted a supporting affidavit from Dr. Orzeck, his free world physician, Dr. Orzeck was not in a position to verify whether plaintiff had been compliant and cooperative with prison physicians, and he did not address the recent improvements in plaintiff's medical condition brought about by plaintiff's relocation from the unmonitored prison dormitory to the monitored prison infirmary. Instead, in opining that TDCJ is unable to provide proper management of plaintiff's medical condition, Dr. Orzeck tacitly assumed that plaintiff had been fully compliant and cooperative with his prison medical care. This assumption both undermines and fails to support plaintiff's claims, as plaintiff's physicians testified in their affidavits that plaintiff was *not* compliant or cooperative. To the contrary, defendants show that only after plaintiff was relocated to a fully-supervised prison environment in the infirmary where his adherence to medical orders was strenuously monitored, were prison physicians able to circumvent plaintiff's non-compliance and bring his medical condition under better control.

In opposing plaintiff's motion for a temporary restraining order, defendants have submitted copies of Dr. Orzeck's 2007-2009 medical records (Docket Entry No. 9, Exhibit G, Sealed Free World Medical Records), and affidavits from plaintiff's prison physicians and clinical pharmacologist regarding plaintiff's recent medical care and condition.

In his affidavit, prison physician Charles (Danny) Adams, M.D., testified to his care and treatment of plaintiff, as follows:

> When [plaintiff] first returned to TDCJ custody in November 2009, Dr. Eric Orzeck, M.D., [his] free world endocrinologist, sent a letter with medical instructions for the management of [plaintiff's] diabetes and the administration

4

of his insulin. In the letter, Dr. Orzeck stated that the insulin dosing instructions 'represent a dose decrease, to avoid low blood sugars.' Dr. Orzeck's instructions were initially followed by the UTMB medical staff caring for [plaintiff] in prison.

Following Dr. Orzeck's orders for the administration of insulin, [plaintiff's] blood sugar began to register at above optimal levels. Further, [his] hemoglobin A1c tests results rose from his last free world reading of 6.4% on November 2, 2009 to 7.3% on November 19, 2009, and to 10.7% on December 23, 2009.

A hemoglobin A1c reading is a measure of plasma glucose concentration in the red blood cells over roughly a three month period. The A1c reading provides a measure of a patient's sugar control over a two to three month period. Ideally, a patient's hemoglobin A1c reading should be between 4.0% to 6.0%. It is significant to note that the medical records supplied by Dr. Orzeck show that [plaintiff's] other A1c readings in the free world ranged between 7.1% and 8.9%. These A1c results demonstrate that even outside of the prison setting, [plaintiff] has poor control over his diabetes.

Dr. Kevin McKinney, M.D., examined [plaintiff] on December 29, 2009, after [plaintiff's] A1c rose from 7.3% in November to 10.7% on December 23. Dr. McKinney is the UTMB endocrinologist at UTMB Hospital Galveston [who] has been [plaintiff's] consulting endocrinologist since 2005 during the periods when [plaintiff] has been in TDCJ custody. Dr. McKinney determined that [plaintiff] was on inadequate amounts of insulin, and increased the insulin levels that had been set by Dr. Orzeck.

Upon [plaintiff's] return to TDCJ custody in November 2009, he was housed in a dormitory setting. The TDCJ dormitory setting is very much like an army barracks in that there are fifty or more bunk beds in a common, secured area. The problem with housing [plaintiff] in a dormitory setting is that he is known to trade his commissary purchases with other inmates for sugary snacks that impair the medical staff's ability to control his diabetes. [Plaintiff] was housed in the dormitory until he was placed in the infirmary on December 21, 2009. During the time [plaintiff] was housed in the dormitory, his A1c level rose from 7.3% on November 19 to 10.7% on December 23.

On December 21, 2009, [plaintiff] was transferred to the infirmary for closer medical supervision. While there are still opportunities for [him] to manipulate his treatment in the infirmary should he choose to do so, medical

providers are able to keep a close eye on [his] activities in the infirmary. Since his time in the infirmary, [plaintiff's] sugar levels have significantly improved from the time he was housed in the dormitory. Due to the nature of his diabetes, [he] still experiences some extreme high and low blood sugar levels even in the infirmary.

As of January 22, 2010, [plaintiff's] most recent A1c levels have come down to 9.5% and are expected to continue to improve. This latest A1c reading is still registering the elevated blood sugars from before Dr. McKinney adjusted [plaintiff's] insulin levels and before [plaintiff] was housed in the infirmary. As [his] diabetic control continues to improve, as it has since his move to the infirmary, his A1c levels should also continue to improve.

I believe that with the full cooperation of [plaintiff], there is no reason why his diabetes cannot be appropriately managed by the medical providers and facilities within the TDCJ correctional setting.

The most important component in treating a patient is the cooperation of the patient. [Plaintiff] is able to manipulate his blood sugar by altering his diet by either eating or not eating food and then keeping this information from the medical team. The amount and type of food consumed by [plaintiff] directly impacts the amount and timing of his insulin. [Plaintiff] routinely frustrates efforts on the part of the medical staff to chart his diet. He also has a history of trading food with other offenders when not under close supervision. [Plaintiff] is also able to have dramatic impact on his sugar by the amount of exercise he engages in. Again, [plaintiff] has a history of hiding the nature and extent of his physical activity from his medical team.

[Plaintiff's] primary motivation at this juncture appears to be using his physical condition as an excuse to be released from prison. He seems to take every opportunity available to him to push his sugar levels to the extremes to bolster his position that he cannot be treated in prison. Release from prison is a very attractive 'secondary gain.' Secondary gain is a medically recognized disease component. Secondary gains are the external advantages that exist as a result of a medical condition, such as monetary and disability benefits, personal attention, or escape from unpleasant situations and responsibilities. It is medically recognized that some patients manipulate their medical conditions to take advantage of these secondary gains.

The medical staff treating [plaintiff] needs an opportunity to treat him with accurate information. [Plaintiff] has shown himself to be unwilling to be a

> part of this team. [His] manipulation is a major factor in the medical team's lack of success to date. Unfortunately, the only option that remains (if [plaintiff] continues to resist treatment) would be to confine him in a manner that he is not allowed access to commissary or any other food stuff (or items that may be traded for food stuff) and that he be monitored in a manner that would preclude any opportunity on his part to manipulate his sugar level through diet or exercise.

(Docket Entry No. 8, Exhibit A.)

In his affidavit, prison physician Aftab S. Ahmad, M.D., detailed his medical care of plaintiff and plaintiff's current conditions:

> On 11/11/2009, I was made aware of the fact that an inmate by the name of Roddy Pippin, a 25 year old Caucasian male, with a TDCJ # 11276478, had been admitted to one of the dorms of Jester III. On review of his previous chart and free world records, I came to understand that he was diagnosed with Type I Diabetes Mellitus at age 6. His diabetes is labeled as severely brittle type of diabetes, which is evident from the fact that his blood sugar levels tend to fluctuate from very low teens to more than five hundreds, in a single day. This is also corroborated from the fact that he has had more than 46 admissions to various hospitals for episodes of either 'Hypoglycemia' or 'Diabetic Ketoacidosis' in the free world.
>
> \* \* \* \*
>
> During his stay at the Jester III dorm, the blood glucose was closely monitored and showed a wide fluctuation from teens to more than 500 mg/dL. Our primary concern was to prevent any severe episodes of hypoglycemia or ketoacidosis. Therefore, consultations from the UTMB endocrinology [and] diabetes clinic and the clinical pharmacologist and dietician were requested. Later consultations were also requested from UTMB ophthalmology for assessment of vison/retina and from optometry to reassess him for corrective lenses.
>
> On clinical pharmacologist's recommendation, another dose of [insulin] was added before the bedtime snack for a smoother control. [Plaintiff] was also made to eat all of his meals in the infirmary and he was referred to PHOP (Physically Handicapped Offender Program) to do required daily exercises under supervision.

He was seen by [the Chief Dietician], who counseled him on diabetic diet, 20 minutes of aerobic exercise, and provided educational material on food pyramid serving size guides, food choices, and other educational material. He continued to have the wide fluctuations of his blood glucose levels, and ended up in ketoacidosis. He was sent to a local free world ER on 12/15/09, where he stayed overnight and [was] treated.

He was also seen by UTMB endocrinologist Dr. Kevin McKinney, M.D., who determined that the insulin levels set by Dr. Orzeck for [plaintiff were] inadequate. Dr. McKinney ordered that the dose of scheduled [insulin] be increased. Due to difficulty in getting consistent blood glucose control in the dormitory setting, it was decided to admit him to a bed at the Jester III infirmary for a more controlled environment, where all his meals, medications, and physical activity could be monitored more closely.

* * * *

During this period in the infirmary, he has shown improving blood glucose levels, with no more high blood glucose levels in the upper 400-500 mg/dL. He has had some low blood sugar levels with no clinical symptoms of hypoglycemia.

As all his meals, exercise, and medication are being closely supervised, this had lead to a smaller dose of [insulin] required to achieve normogylcemia. This justifies his placement in a close[ly] monitored environment.

Currently, finger stick blood glucose checks from 1/23/10 and 1/24/10 show much better glucose levels.

His room in Jester III is near the MD's consultation room and the impatient nursing room is also close by. The door of his room has a glass window for observation and Jester III has 24 hour a day/7 days a week nursing available along with security guards during all times.

[Plaintiff's] most recent A1c levels have come down to 9.5% on 1/22/10. This latest A1c result is still registering the elevated blood sugars from before Dr. McKinney adjusted [his] insulin levels and before [he] was housed in the infirmary. Further decrease in hemoglobin A1c is expected on follow up testing, due to better fingerstick results. He has been ordered follow up labs, and we will monitor the results, making changes in his treatment plan as required.

\* \* \* \*

> As is evident from [the] above discourse/details, [plaintiff] is an ambulatory Caucasian male, who currently appears to be in good general health with improved control of his blood sugar. He does indeed have Type I Diabetes Mellitus, which requires fairly close monitoring and I believe that the patient is receiving the necessary monitoring, diet, physical activity, medications, nursing and medical care, and specialist consults that are required for his care, in the TDCJ system.

\* \* \* \*

> It is my belief that with the full cooperation of [plaintiff], there is no reason why his diabetes cannot be appropriately managed by the medical providers and facilities available within the TDCJ correctional setting. [Plaintiff] is not having finger sticks above goal for post prandial blood sugar levels and is showing significant improvement from the time when he was housed in the dormitory and allowed unsupervised activity.

(Docket Entry No. 8, Exhibit B.)

Dr. Madhani, the prison clinical pharmacologist responsible for plaintiff's insulin medications during both episodes of plaintiff's incarceration in TDCJ, testified as follows:

> During his first period of [incarceration and] treatment, I became aware that [plaintiff] exhibited manipulative and self-destructive behaviors, such as being untruthful to medical providers, as documented in his medical record. Specifically, [he] had been observed taking insulin and skipping meals, scraping food into the toilet, and eating without first taking his insulin. These deceptive actions were observed on the Jester III unit and his other units of previous assignment. If undetected, these actions prevent a medical provider from supplying him the correct amount of insulin, and adversely affect his blood sugar control. [Plaintiff] was referred to see psychiatrists and/or psychologists for his self-destructive behavior, but he refused.

> When [plaintiff] returned to TDCJ in November 2009, I was already familiar with his medical condition from his previous period of incarceration. Since his return to TDCJ, I have had two visits with him – on November 19, 2009 and on January 22, 2010.

\* \* \* \*

During our November meeting, [plaintiff] did not exhibit a willingness to be responsible for his own well-being. I questioned [him] about his insulin regimen in the free world, and he denied knowing what his insulin dose was when he was under house arrest. I find it unlikely that a Type-I diabetic who self-administers his own insulin several times a day would not know his sliding scale. The sliding scale tells a patient how much insulin to administer based on the results of his finger stick blood sugar test. Based on my experience with other diabetic patients, the sliding scale becomes rote memory rather quickly.

[Plaintiff] denied knowing how to count carbohydrates, or what his insulin dose was when he was under house arrest. [His] manner in the interview was very abrupt and slightly defiant. He did not meet my eyes when answering my questions, his answers indicated deception, and his body language was closed off. Based on these factors, I believe that he was an unwilling participant in our consultation. I therefore noted that I did not expect him to take any personal responsibility for his own care.

Due to his prior manipulative behavior, [plaintiff] eats all of his meals in the medical department where he can be more closely supervised. From a review of his TDCJ medical records from the two weeks prior to our November consultation, I suspected that [plaintiff] may have been secretly ingesting more food when he leaves the medical department and returns to his dorm.

\* \* \* \*

The day of our November consultation, [plaintiff's] hemoglobin A1c reading was 7.3%. . . . Following our November consultation where I suspected that [plaintiff] was not fully cooperating with our medical efforts, his A1c reading rose to 10.7% on December 23, 2009.

\* \* \* \*

Since his time in the infirmary, [plaintiff's] sugar levels have significantly improved from the time he was housed in the dormitory. Due to the nature of his diabetes, [plaintiff] still experiences some extreme high and low blood sugar levels even in the infirmary.

\* \* \* \*

> [Plaintiff] has demonstrated that his blood sugar readings improve as his opportunities for manipulation decrease. I believe that with the full cooperation of [plaintiff], there is no reason why his diabetes cannot be appropriately managed by the medical providers and facilities available within the TDCJ correctional setting.

(Docket Entry No. 8, Exhibit C.)

Given plaintiff's current housing in the prison infirmary, which allows his medical care providers to constantly monitor his activities and ensure his adherence to medical orders, and in light of his prison physicians' satisfaction with his improving and stabilizing medical condition following this relocation to a supervised and monitored environment, plaintiff establishes neither a substantial likelihood of success on his underlying case or that temporary orders are necessary to prevent irreparable injury. Plaintiff's requested temporary relief is unwarranted.

## *Conclusion*

Plaintiff's motion for a temporary restraining order (Docket Entry No. 2) is DENIED. The Court will enter a separate docket control order setting this case for trial.

This is an INTERLOCUTORY ORDER.

The Clerk will provide a copy of this order to the parties.

Signed at Houston, Texas, on June 14, 2010.

_____
Gray H. Miller
United States District Judge